**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 9 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

JAY VAN JACKSON, III, aka Little
Jay,

      Defendant-Appellant.

No. 97-8056
(District of Wyoming)
(D.C. No. 96-CR-78-2)

_____

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

PAUL SHELDON CROMARTIE, aka
Shy-lo; aka Paul Miller,

      Defendant-Appellant.

No. 97-8057
(District of Wyoming)
(D.C. No. 96-CR-78-1)

**ORDER AND JUDGMENT**[*]

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Before **BRORBY**, **BRISCOE,** and **MURPHY**, Circuit Judges.

_____

Defendants Jay Van Jackson and Paul Sheldon Cromartie appeal from their convictions and sentences for various firearm charges. Exercising jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), this court affirms.

## I. BACKGROUND

Jackson, Cromartie, and co-defendant John Henry Wilson[1] were charged together in a seven-count indictment and were jointly tried in February 1997. Jackson, Cromartie, and Wilson were charged with conspiring to receive, possess, and transport stolen firearms, in violation of 18 U.S.C. § 371 (count one). Cromartie and Jackson were also charged with possession of a firearm in relation to a drug trafficking felony, in violation of 18 U.S.C. § 924(c) (count five), and possession of a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1) (counts two and six). Cromartie was further charged with possession of a firearm while under indictment, in violation of 18 U.S.C. § 922(n) (count three), and unlawful manufacture of a firearm, in violation of 26 U.S.C. §§ 5822, 5861(f), and 5871 (count four).

_____

[1]Wilson's appeal from his convictions and sentence has been resolved in a separate decision. _See United States v. Wilson_, No. 97-8069, 1998 WL 165120 (10th Cir. April 2, 1998) (unpublished decision).

At trial, the government introduced evidence that Jackson, Cromartie, and Wilson had conspired to unlawfully possess, store, and transport firearms stolen by three juveniles. The three juveniles, Jayson, Jerry, and Will, testified at trial that they escaped from the Goodwill Industries secure facility on March 23, 1996. About three days after their escape, they stole a vehicle and drove from Cheyenne to Centennial, Wyoming. There they burglarized approximately six cabins, stealing primarily alcohol and small items such as gloves and flashlights, before stealing another vehicle and driving back to Cheyenne.

Once in Cheyenne, the juveniles met up with Jackson (Will's cousin) and Cromartie, who were staying at the Quality Inn. From this time through April 10, 1996, the time frame of the conspiracy as charged in the indictment, Jackson and Cromartie stayed at a number of motels in Cheyenne, changing motels every few days. The juveniles stayed with Defendants in the motels for much of this time. During this period, the juveniles stole firearms from three homes around Cheyenne.

On March 30, Jayson and Jerry burglarized a home on Ames Avenue ("Ames residence"), stealing a semi-automatic shotgun. After stealing the shotgun, they hid it in an abandoned garage. When they returned to the motel where Jackson and Cromartie were then staying, they told Defendants about the shotgun. Jackson arranged for a friend to take Jerry to retrieve the shotgun.

After the shotgun was brought to the motel room, Cromartie sawed off the barrel and stock of the shotgun with a hacksaw borrowed from the motel.

Later that night, Jayson and Jerry burglarized a residence located on the F.E. Warren Air Force Base ("Air Force Base residence"). Jackson arranged for a friend, "Dirty Red," to drive Jayson and Jerry onto the base for the burglary and to pick them up when they had finished. Jayson and Jerry stole six firearms from the home. Jayson testified that in return for firearms taken from the Ames and Air Force Base residences, Jackson paid them in cash and crack cocaine.

A few days later, Jackson and Cromartie drove the three juveniles to a trailer they had been told contained firearms. Jackson and Cromartie stayed behind in the car while the juveniles broke into the trailer. The juveniles stole some personal items and drugs, but did not find any firearms. Later that night, Jayson and Jerry burglarized a home near the motel to obtain money for their motel room. Jerry was caught by the police that night.

On April 4, while Jackson and Cromartie were staying at the Days Inn, the motel manager called the police because Jackson, Cromartie, and others were having a party. When the police arrived, Will and Jayson jumped out the window and ran away. Jackson and Cromartie were arrested. Jackson was released almost immediately; Cromartie was held in jail.

-4-

Will and Jayson met Jackson again the next day through his friend "Dirty Red." That night, Will and Jayson burglarized a residence on Sagebrush ("Sagebrush residence"). Jackson drove them to the residence and dropped them off in a nearby alley. They then burglarized the home and paged Jackson afterwards to pick them up. Will and Jayson stole six firearms and some knives from the Sagebrush residence. Jackson initially offered Jayson a beeper and a pistol for the firearms, but Jayson declined the offer because he wanted money for the guns. Jackson told him he would have to wait for the money. The firearms were later moved to Wilson's house.

On April 10, Cheyenne police obtained a search warrant and searched Wilson's home for firearms taken in the burglaries of the Ames, Air Force Base, and Sagebrush residences. The police recovered most of the firearms stolen in the burglaries, including a sawed-off shotgun identified as the shotgun stolen from the Ames residence.

The juveniles testified that before the burglaries, they discussed stealing firearms with Jackson and Cromartie and were told by Defendants that if they got the guns, they would be paid well for them. There was also evidence presented at trial concerning Defendants' transportation and storage of the firearms in the various motel rooms, and evidence that Defendants planned to transport firearms to Denver, Colorado and planned to put the firearms "on the street."

Following trial, Jackson and Cromartie were found guilty of all the charges. Jackson was sentenced to imprisonment for 120 months on count six, 60 months on count one, and 60 months on count five, all to be served consecutively. Jackson also received supervised release and was ordered to pay a special assessment. Cromartie was sentenced to imprisonment for 110 months on count two and 58 months on count four, to be served consecutively; 60 months on count one and 60 months on count three, to be served concurrently; and 60 months on count five, to be served consecutively to the other sentences. Cromartie also received supervised release and was ordered to pay restitution, fines, and a special assessment.

## II. DISCUSSION

### A. Evidence of Other Acts

Jackson and Cromartie first argue the district court improperly admitted evidence of uncharged bad acts. Defendants primarily challenge testimony concerning drug trafficking, including testimony that many people came in and out of various motel rooms, that Jackson was selling drugs and always had large amounts of cash, that Jackson provided crack and other drugs and alcohol to minors (the juveniles), and that various people smoked crack and other drugs in the motel rooms. Defendants also argue the district court improperly admitted

evidence of firearms in Defendants' control before the juveniles burglarized any homes for guns.[2]

Defendants argue the challenged evidence had no relevance to the offenses charged, as Defendants were not charged with drug trafficking or drug possession and the firearms referred to in the challenged testimony were not identified in the indictment. Defendants further argue that even if the evidence was relevant, it did not meet the requirements of Federal Rule of Evidence 404(b). At trial, the court ruled that the evidence was admissible as "res gestae." *See United States v. Kimball*, 73 F.3d 269, 272 (10th Cir. 1995) ("Evidence of other crimes should not be suppressed when those facts come in as *res gestae*—as part and parcel of the proof of the offense [] charged in the indictment." (alteration in original)(internal quotations omitted)). This court reviews the district court's evidentiary rulings for abuse of discretion. *See United States v. Cestnik*, 36 F.3d 904, 906 (10th Cir. 1994).

---

[2]Defendants also assert the district court improperly admitted evidence informing the jury that "one of the Defendants had exercised his constitutional rights to require a search warrant." In support, Defendants cite a place in the record where the government sought to introduce the affidavit for a search warrant of co-defendant Wilson's home. At trial, defense counsel asserted that by seeking to introduce the affidavit, "they are setting forth and putting undue influence on the fact that Mr. Wilson exercised his constitutional rights to have a search warrant." It is unclear exactly what evidence or testimony Defendants are challenging. Defendants have also not explained how this evidence could have prejudiced them. This court therefore rejects Defendants' challenge to this evidence.

Rule 404(b) applies only to evidence of acts extrinsic to the charged crimes. *See United States v. Johnson*, 42 F.3d 1312, 1316 (10th Cir. 1994). An uncharged act may not be extrinsic if it was "part of the scheme for which a defendant is being prosecuted" or if it was "'inextricably intertwined' with the charged crime[s] such that a witness'[s] testimony 'would have been confusing and incomplete without mention'" of the uncharged act. *Id.* (quoting *United States v. Record*, 873 F.2d 1363, 1372 n.5 (10th Cir. 1989)).

Although Defendants were not charged separately with drug trafficking, the evidence of drug trafficking was intrinsic to the charges contained in counts one and five. Count one of the indictment charged Defendants with conspiracy to receive, possess, and transport stolen firearms. The indictment alleged that as part of the conspiracy, Defendants used various motel rooms to plan and carry out the theft and storage of the firearms and offered to pay juveniles in cash and crack cocaine for firearms stolen by the juveniles. Overt act number twelve in the indictment alleged that Defendants actually paid one of the juveniles cash and crack cocaine as payment for stealing five firearms from two houses. Count five of the indictment charged Defendants with unlawfully distributing crack cocaine in exchange for firearms. The drug trafficking testimony challenged by Defendants thus involved conduct which was part of the overall scheme for which Defendants were being prosecuted. *Cf. id.*

The evidence of drug trafficking was also "inextricably intertwined" with the charged crimes. The evidence of Defendants' drug trafficking was necessary to explain the circumstances of the conspiracy and to explain why illegal drugs were available to exchange for firearms. Further, the evidence formed an "integral and natural part of the witnesses' accounts of the circumstances surrounding the offenses for which the defendant[s] [were] indicted." *United States v. Foster*, 889 F.2d 1049, 1054 (11th Cir. 1989) (internal quotations omitted). Without the evidence, the witnesses' testimony concerning the exchange of firearms for drugs would have been confusing and incomplete.

The challenged evidence of firearms in Defendants' control before the juveniles burglarized any homes for guns was also relevant and integral to the charged crimes. The evidence established, with the evidence of drug trafficking, that contrary to Defendants' contention, the juveniles joined an ongoing conspiracy involving guns and drugs. Further, the presence of guns has been recognized as one of the "tools of the trade" in the distribution of illegal drugs. *United States v. Martinez*, 938 F.2d 1078, 1083 (10th Cir. 1991). Therefore, as with the other evidence of drug trafficking, the evidence of additional firearms not provided by the juveniles was admissible.

Defendants also argue the challenged evidence should have been excluded under Federal Rule of Evidence 403 because its probative value was substantially

outweighed by the danger of unfair prejudice. "Evidence is not unfairly prejudicial simply because it is damaging to an opponent's case." *Id.* at 1082. Instead, to be unfairly prejudicial, it must have "an undue tendency to suggest decision on an improper basis." *Id.* (internal quotations omitted). Defendants have not demonstrated that the evidence was unfairly prejudicial. This court thus concludes the district court did not abuse its discretion in admitting the challenged evidence.

## B. Admission of Lay Opinion Testimony

Jackson and Cromartie argue the district court abused its discretion in allowing the juveniles to give lay opinion testimony concerning the crack cocaine they allegedly received in partial payment for the firearms taken in two of the burglaries. Defendants assert there was insufficient foundation for the witnesses' testimony that the substance they received as payment for the firearms was crack cocaine. Defendants assert that because the juveniles were improperly allowed to testify that the substance was crack cocaine, an essential element of count five under the indictment, the government failed to meet its burden of proof of establishing that Defendants exchanged firearms for crack cocaine. *See United States v. Uwaeme*, 975 F.2d 1016, 1019-20 (4th Cir. 1992) (noting government must prove every element of the crime charged beyond a reasonable doubt, including, in drug cases, the chemical make-up of the drug).

"The government need not introduce scientific evidence to prove the identity of a substance. As long as there is sufficient lay testimony or circumstantial evidence from which a jury could find that a substance was identified beyond a reasonable doubt, the lack of scientific evidence does not warrant reversal." *United States v. Sanchez DeFundora*, 893 F.2d 1173, 1175 (10th Cir. 1990) (citation omitted); *see also United States v. Wright*, 16 F.3d 1429, 1439-41 (6th Cir. 1994); *United States v. Eakes*, 783 F.2d 499, 504-05 (5th Cir. 1986); *United States v. Dolan*, 544 F.2d 1219, 1221 (4th Cir. 1976).

Although lay testimony may be used to establish the identity of a certain substance, a foundation is of course necessary. Federal Rule of Evidence 701 specifically provides that a lay witness may testify in the form of opinions or inferences when they are "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness'[s] testimony or the determination of a fact in issue." A district court has "broad discretion to determine whether a lay witness is qualified under Rule 701 to testify on a matter of opinion." *United States v. Borrelli*, 621 F.2d 1092, 1095 (10th Cir. 1980).

Courts have allowed drug dealers and drug users to give their opinion that certain substances were illegal drugs, provided a foundation was laid based on their past experience and personal observation of the relevant events. *See, e.g.*, *United States v. Cantley*, 130 F.3d 1371, 1378-79 (10th Cir. 1997), *cert. denied*,

118 S. Ct. 1098 (1998); *Wright*, 16 F.3d at 1439-41; *United States v. Walters*, 904 F.2d 765, 770-71 (1st Cir. 1990); *Sanchez DeFundora*, 893 F.2d at 1175-76; *United States v. Paiva*, 892 F.2d 148, 156-57 (1st Cir. 1989); *United States v. Brown*, 887 F.2d 537, 542 (5th Cir. 1989); *United States v. Tinsley*, 800 F.2d 448, 450 (4th Cir. 1986).

The government relied on the testimony of the three juveniles to establish that Defendants exchanged firearms for crack cocaine. Jayson was first to testify. Jayson testified that while they were at the Quality Inn, about fifteen or twenty people came into the motel room for a few minutes. These people would go into the bathroom for a short period of time. Some would then come out and smoke a substance on a can; others would leave quickly.

Jayson further testified that Jackson gave him "rock," which he identified as crack cocaine, as payment for the guns taken from the Ames and Air Force Base residences. He testified that he knew it was crack because he smoked it later that night, although he stated that he had never seen crack before that time. He also described how he smoked it using a pop can. He testified that "at the time [he] thought [the rock] was big because [he] really didn't know nothing about it," but that based on what he later learned it was probably less than $200 worth of crack. He also testified that he only smoked crack a few times, including once with Cromartie at the Hitching Post Inn.

Jerry, like Jayson, testified that people came in and out of the motel room buying drugs and that these people sometimes smoked the drugs in the room after the purchase. He stated that the people were buying and smoking crack. He testified that he knew it was crack because he had seen and smelled it before, although he had not previously used crack at that time.

Jerry testified that Jayson gave him $125 and "five 20 pieces of crack cocaine" for his participation in the gun thefts, although he did not personally participate in the actual exchange of the guns for money and drugs between Jayson and Defendants. He explained that "five 20 pieces" meant "five $20 pieces" of crack. When asked how he knew what the substance was, he stated that "[i]t was pretty obvious to tell" and that he had seen it before. He demonstrated the approximate size of the pieces of crack cocaine he was given by tearing up paper and crumpling it up. He further described the substance as "kind of smooth" with "lots of different sides to it" and as being hard and an "off-white" color.

Jerry testified he smoked the crack with Jayson that night and through the next day, and stated that this was the first time he had smoked crack. He further described how crack cocaine is smoked using a can and described the high he experienced smoking the crack as different from the high he experienced when smoking marijuana. Jerry also testified that although he had seen crack cocaine

before Jayson gave him the crack, he hadn't seen crack before he escaped from Goodwill about a week earlier.

Will testified that Jackson, his cousin, sold crack. He stated that he knew it was crack because he had seen it before, and he testified that he had been exposed to crack for "[m]aybe a year." Will described how crack cocaine is sold, stating that "[y]ou can buy 20 pieces, 50 pieces, 100 pieces" or larger pieces. He stated that "crack cocaine" and "rock cocaine" are the same thing. He testified that Jackson was selling "20s, 50s, 100s," although he stated he wasn't present during the sales.

Will also testified that he got crack from Jackson and sold it, and he estimated he sold about $5000 of crack during the period between his escape from Goodwill until he was captured by authorities. Will testified that on the day Jackson and Cromartie allegedly exchanged crack cocaine for guns, he saw Jayson with crack and Jerry with cash. He testified, however, that he didn't observe them actually receive the crack and cash from Defendants, but instead saw them "[a]bout twenty minutes later." Will also testified that Jayson gave Cromartie about a fifty-piece of crack to sell, but stated that he didn't know where Jayson got that crack and that he didn't see Cromartie selling any crack.

-14-

Will testified he had never used crack. He also testified he had no knowledge of the alleged transfer by Jackson of guns for drugs and stated he didn't know why Jackson gave some cash and crack to Jayson.

Based on the above testimony, the district court did not abuse its broad discretion in determining there was adequate foundation for the witnesses to testify as to their opinion that the substance in question was crack cocaine. The juveniles all testified they recognized the substance to be crack. Jerry and Will testified they had seen crack before this incident, and Jerry also testified he had smelled crack before, although all three witnesses testified they had not previously used crack cocaine. Jayson and Jerry described smoking the crack that night and a few times later. Jerry described the appearance of the substance, stating it was hard, rock-like, and an off-white color. Both Jayson and Jerry described how it could be smoked using a pop can. *Cf. Paiva*, 892 F.2d at 157 (permitting drug user to express opinion that substance she found was cocaine when "opinion was based on her past experience with cocaine and her personal observations, the appearance and taste, of the substance"). Jerry and Will also demonstrated that they were familiar with how crack is sold. *Cf. Tinsley*, 800 F.2d at 450 (allowing opinion testimony from lay witnesses experienced in using methamphetamine and who were "familiar with its appearance and the economics of supplying, buying, and selling it"). Will further testified that he actually sold

some crack that he got from Jackson. *Cf. Wright*, 16 F.3d at 1439-41 (allowing opinion from lay witnesses who testified they had used and sold crack cocaine); *Sanchez DeFundora*, 893 F.2d at 1176 (same).

The juveniles' testimony satisfied the requirements of Rule 701. Jayson, Jerry, and Will had firsthand knowledge of the events they described. Although only Jayson participated in the actual exchange of the crack and cash for the guns, Jerry testified that he was in the motel room while Jayson was receiving the crack in the back room, and testified that after it took place Jayson came back with money and crack. Will also testified that he saw Jayson and Jerry with money and crack about twenty minutes later. This, in connection with their descriptions of their knowledge of and experience with crack cocaine, met the requirement of Rule 701 that lay opinion be rationally based on the perception of the witness. The testimony was also helpful to determine a fact in issue, whether crack cocaine was exchanged for stolen firearms, thus satisfying the second requirement of Rule 701. The district court thus did not abuse its broad discretion in admitting the lay opinions of Jayson, Jerry, and Will.[3]

---

[3]Defendants have not argued they were denied the opportunity to challenge the juveniles' knowledge of crack cocaine and their characterizations of the substance as crack cocaine on cross-examination. Defendants have also apparently not argued that the testimony, if properly admitted, was insufficient to allow the jury to find beyond a reasonable doubt that the substance exchanged for the firearms was crack cocaine.

## C. Sentencing

### 1. Cromartie

Cromartie argues the district court erred in sentencing him for a conspiracy involving nine firearms when his relevant conduct involved at most seven firearms. Cromartie asserts that at least two of the guns were stolen by co-conspirators after he had withdrawn from the conspiracy and while he was jailed on a separate matter. He therefore asserts his sentence should not have been enhanced under U.S.S.G. § 2k2.1(b)(1)(C) by three levels, but that any enhancement should have at most been two levels.[4]

This court reviews the district court's factual findings under a clearly erroneous standard, giving due deference to the district court's application of the Sentencing Guidelines to the facts. *See United States v. Lacey*, 86 F.3d 956, 967 (10th Cir.), *cert. denied*, 117 S. Ct. 331 (1996). Questions of law regarding the application of the Sentencing Guidelines are reviewed de novo. *See id.*

At sentencing, Cromartie's attorney argued that he should not be responsible for the burglary of the Sagebrush residence that took place after he was in jail because the burglary was spontaneous and not planned. He further argued that "the facts of this case are that the people joined a loose association

---

[4]U.S.S.G. § 2k2.1(b)(1) provides that if the offense involved five to seven firearms, the sentencing court should apply a two-level increase, and if the offense involved eight to twelve firearms, a three-level increase is required.

which could be a conspiracy which operated from periodic times that they met. And by [Cromartie's] leaving, physically leaving the area, I think that is a withdrawal." The district court found that, based on the evidence presented at trial, Cromartie was a member of the conspiracy and "is responsible for the acts of the conspirators, which include the [Sagebrush] robbery, even though he was then in jail at the time." The court further found there was no evidence Cromartie withdrew from the conspiracy.

The Sentencing Guidelines provide that all relevant conduct should be taken into account at sentencing. U.S.S.G. § 1B1.3(a)(1)(B) provides that such relevant conduct includes,

> in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction.

Pursuant to this section, a defendant is responsible both for acts in which he was directly involved and for all reasonably foreseeable acts of co-conspirators done in furtherance of the conspiracy of which he was a member. *See United States v. Ruiz-Castro*, 92 F.3d 1519, 1538 (10th Cir. 1996).

Absent any affirmative withdrawal, a defendant remains part of the ongoing criminal enterprise. *See United States v. Torres*, 53 F.3d 1129, 1144 n.15 (10th

Cir. 1995). "Although a conspirator's arrest or incarceration by itself is insufficient to constitute his withdrawal from the conspiracy, an arrest may under certain circumstances amount to a withdrawal." *United States v. Melton*, 131 F.2d 1400, 1405 (10th Cir. 1997) (citation omitted). Apart from referring to his incarceration on another matter at the time of the Sagebrush burglary when the two additional firearms were stolen, Cromartie has cited no evidence indicating he took affirmative steps to disassociate himself from the conspiracy. Instead, he argues generally that the criminal activity in which he was involved was a series of isolated burglaries involving juveniles. The district court properly stated at the sentencing hearing that this was an argument for the jury. The record verifies the district court's findings that Cromartie was a member of the conspiracy and that he did not withdraw from the conspiracy. Consequently, these findings are not clearly erroneous. *Cf. Ruiz-Castro*, 92 F.3d at 1538.

The further theft of firearms by Cromartie's co-conspirators, which continued the same pattern of criminal activity, was reasonably foreseeable and was within the scope and in furtherance of the conspiracy of which Cromartie was a member. The district court therefore did not err in holding Cromartie responsible for the acts of his co-conspirators and in applying a three-level enhancement pursuant to U.S.S.G. § 2K2.1(b)(1)(C).

**2. Jackson**

### a. Base Offense Level

Jackson argues the district court erred in calculating his base offense level. Pursuant to U.S.S.G. § 2K2.1(a)(3), the district court set Jackson's base offense level at 22 based on the presence of a sawed-off shotgun and Jackson's prior felony conviction for a crime of violence, a 1989 conviction for simple robbery.

Jackson first argues the district court improperly relied on the sawed-off shotgun in reaching the base offense level because the evidence showed he was not involved in sawing off the shotgun and was not present when the shotgun was altered. He also asserts it was improper to rely on the sawed-off shotgun in determining his base offense level because he was not charged with sawing off a shotgun.

For sentencing purposes, a defendant's relevant conduct is not restricted to conduct for which the defendant was specifically charged and convicted. *See* U.S.S.G. § 1B1.3 background. Furthermore, as discussed above, in determining a defendant's relevant conduct the sentencing court considers the actions not only of the defendant but also of the defendant's co-conspirators that were reasonably foreseeable and in furtherance of jointly undertaken criminal activity.

In the indictment, the sawing off of the shotgun was included as one of the overt acts of the conspiracy for which Jackson was charged. At sentencing, the district court stated the evidence showed that Jackson and Cromartie were the two

leaders in the activities being conducted from the various motel rooms and that at the time the shotgun was sawed off, Jackson was present. The court further determined that Jackson was a participant in the alteration of the shotgun.

The court's determination that Jackson was responsible for sentencing purposes for the sawed-off shotgun was supported by the evidence and was not in error. There was substantial evidence in the record to support the district court's finding that Jackson and Cromartie were leaders in the conspiracy activities involving the stolen firearms. Although there was conflicting evidence as to whether Jackson was present in the motel room when the shotgun was sawed off, at least one witness, Will, testified that he, "Jay [Jackson,] . . . Jerry and Ja[y]son" were present when Cromartie cut down the shotgun. The evidence also indicated Jackson was aware of the sawed-off shotgun after it was altered and was involved in transporting it to co-defendant Wilson's house, where it was recovered by police. Accordingly, we reject Jackson's argument that the district court improperly considered the sawed-off shotgun in determining his base offense level.

Jackson further argues the district court improperly engaged in double counting by considering his prior conviction for simple robbery in calculating both his base offense level under U.S.S.G. § 2K2.1(a)(3) and his criminal history category under U.S.S.G. § 4A1.1. We reject this argument. Even assuming the

district court erred in considering Jackson's prior conviction in determining his criminal history after considering it for purposes of determining his base offense level, the inclusion of the conviction in his criminal history did not affect Jackson's criminal history level. Based on Jackson's prior criminal convictions, he had a total of nineteen criminal history points. Of these points, three were due to his prior robbery conviction. Under the Sentencing Guidelines, thirteen or more points establishes a criminal history category of VI. *See* U.S.S.G. Ch. 5, Pt. A. Therefore, even excluding the three points from his prior robbery conviction, his criminal history category would remain at VI.

Moreoever, the Sentencing Guidelines permit the sentencing court to consider a prior felony conviction in determining both a defendant's base offense level and criminal history category. Application note 15 of U.S.S.G. § 2K2.1 expressly provides that "[p]rior felony conviction(s) resulting in an increased base offense level under subsection . . . (a)(3) . . . are also counted for purposes of determining criminal history points." *See United States v. Wimbush*, 103 F.3d 968, 970 (11th Cir.) (per curiam) (holding use of defendant's prior felony convictions to increase base offense level and to determine criminal history did not constitute impermissible double counting), *cert. denied*, 117 S. Ct. 1859 (1997); *United States v. Hawkins*, 69 F.3d 11, 13-15 (5th Cir. 1995). The district court therefore did not err in determining Jackson's base offense level.

### b. Enhancement for Obstruction of Justice

Jackson next argues the district court erred in applying an enhancement for obstruction of justice under U.S.S.G. § 3C1.1 based on evidence that Jackson threatened a witness. Although this witness testified both before the grand jury and at trial, she only testified concerning the threat before the grand jury. To counter the evidence of the alleged threat, Jackson introduced the statement of Matt Escobedo, the person who allegedly delivered the threat to the witness, in which he denied threatening the witness. Jackson argues the district court erred in refusing to give weight to this denial by Escobedo.

U.S.S.G. § 3C1.1 provides that a defendant's offense level must be increased by two levels "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." Such obstruction includes threatening a witness, "directly or indirectly, or attempting to do so." U.S.S.G. § 3C1.1 application note 3.

In applying the obstruction-of-justice enhancement, the district court relied on both the witness's grand jury testimony and the Presentence Report ("PSR"). The PSR described the circumstances surrounding the threat and explained that Escobedo admitted it had occurred but had been forced by Jackson to sign a statement recanting the information. The district court stated that the witness's

testimony before the grand jury confirmed the information in the PSR and also indicated the witness was afraid of Jackson and feared he would hurt her. The court further found that Escobedo's unsworn statement was not believable and was induced by Jackson.

Based on the evidence contained in the PSR, which was supported by the grand jury testimony, the district court did not clearly err in finding the Escobedo statement was not believable and that Jackson actually conveyed or attempted to convey a threat to a witness. The district court therefore properly applied the enhancement.

### c. Enhancement for Role in Offense

Jackson finally argues the district court erred in enhancing his sentence based on his role as a leader in the offense because the court did not articulate the four individuals over whom Jackson exercised control.

The district court applied a two-level enhancement pursuant to U.S.S.G. § 3B1.1(c) based on Jackson's role in the offense. U.S.S.G. § 3B1.1(a) provides for a four-level increase "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(c) provides for a two-level increase if the defendant was an "organizer, leader, manager, or supervisor" in any criminal activity involving fewer than five participants. Although there were five or more

participants involved in this case, the PSR recommended, and the district court applied, a two-level enhancement under § 3B1.1(c) because some of the participants were juveniles, resulting in a separate two-level enhancement under U.S.S.G. § 3B1.4.

Under the standards of either § 3B1.1(a) or (c), the district court did not err in applying the enhancement. At sentencing, defense counsel argued the enhancement did not apply because the evidence did not show that Jackson exercised control over four others and because the court had already found that Cromartie was a leader. Defense counsel apparently did not contest that there were at least five participants in the criminal activity. The court found that the evidence showed Jackson was a leader or organizer. The court also stated that based on the evidence, Jackson and Cromartie were the two leaders in the activities conducted from the various motel rooms around Cheyenne.

The record supports the district court's finding that Jackson was a leader or organizer in the criminal enterprise. The juveniles testified at trial that Jackson told them if they stole firearms he would pay them. There was evidence presented at trial that Jackson arranged for, or himself provided, transportation for the juveniles to and from burglaries; that he arranged for the movement and storage of the stolen firearms; and that he planned to transport the firearms across state lines and onto the streets. The record also establishes that the criminal enterprise

involved at least five individuals. In addition to the three co-defendants who were each charged and convicted of conspiracy charges, the indictment identified three juveniles involved in the activity. These juveniles testified at trial concerning their involvement in the joint criminal activity and the leadership or organizational role of both Jackson and Cromartie.

The district court's finding that both Jackson and Cromartie were leaders does not preclude the enhancement. The Sentencing Guidelines explicitly provide that "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1 application note 4. In addition, to enhance for a leadership or organizational role, the government need not establish that the defendant exercised control over four others. It is sufficient that the government prove the defendant exercised control over at least one of the participants. *See United States v. Cruz Camacho*, 137 F.3d 1220, 1224 (10th Cir. 1998) (for § 3B1.1(a) enhancement to apply, government most prove that five persons participated in the criminal venture and that the defendant exercised leadership control over at least one person); *see also* U.S.S.G. § 3B1.1 application note 2. The record here established that Jackson and Cromartie exercised control over the juveniles, who were participants in the criminal enterprise. The district court did not err in applying the enhancement.

-26-

## III. CONCLUSION

For the reasons discussed above, this court **AFFIRMS** the convictions and sentences of Jackson and Cromartie.

ENTERED FOR THE COURT:


Michael R. Murphy
Circuit Judge

No. 97-8056, <u>United States v. Jackson</u>
No. 97-8057, <u>United States v. Cromartie</u>

**BRISCOE**, Circuit Judge, concurring and dissenting:

I concur in part and dissent in part. I agree with the majority that the district court did not err in admitting evidence of uncharged bad acts or in sentencing defendants. However, I conclude the court erred in allowing two of the three juvenile witnesses to provide lay opinion testimony that the substance involved in the conduct described in Count 5 was crack cocaine. Count 5 charged defendants with possession of a firearm in connection with a drug trafficking offense, in violation of 18 U.S.C. § 924(c), and specifically alleged defendants unlawfully distributed crack cocaine in exchange for stolen firearms. Further, I conclude the court's error in the admission of this lay opinion testimony was not harmless and I would reverse defendants' convictions on Count 5. I concur in affirming the balance of defendants' convictions and sentences for the reasons stated by the majority.

Federal Rule of Evidence 701 governs opinion testimony from lay witnesses:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

As this language makes clear, there are two requirements for admission of lay

opinion testimony.  See 29 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure § 6254 at 126 (1997).  First, lay opinion testimony must be "rationally based on the perception of the witness."  Id.  Second, lay opinion testimony must be "'helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.'"  Id. § 6255 at 147 (quoting Rule 701).

I agree with the majority that the lay opinion testimony at issue was helpful to the determination of a fact in issue.  I focus my attention instead on whether the testimony was rationally based on the perception of the lay witnesses.  The requirement that lay opinion be rationally based on the perception of the witness "is itself divisible into two parts: (1) the witness must have perceived with his senses the matters on which his opinion is based, and (2) there must be a rational connection between the witness' opinion and his perceptions."  Id. § 6254 at 16.  Here, there is little question the three juveniles perceived with their senses the matters on which they based their lay opinions.  All personally observed the substance about which they testified.  Two of the juveniles ingested the substance and testified it gave them a quick "rush" similar to "an adrenaline rush," which was different from the high they had previously experienced when they ingested marijuana.  Therefore, the critical question is whether there was a rational connection between the witnesses' perceptions and their opinions as to the identity of the substance.

Even if a witness has perceived a matter with his senses, the second component of personal knowledge requires that he ha[ve] the experience necessary to comprehend his perceptions. In many cases, comprehension requires no more experience than that presumably universal to the human condition. However, where the lay witness observes matters that can be comprehended only with specialized experience, it may be necessary to demonstrate that the witness has such experience. For example, where the witness testified that the substance he tasted was cocaine . . ., experience with th[is] substance[] is essential to showing that the opinion is "based on the perception of the witness."

29 Wright & Gold, supra § 6254 at 133.

In a limited number of cases, federal courts have allowed lay witnesses, who are typically experienced drug users, to offer opinions concerning the nature of illegal substances. See United States v. Paiva, 892 F.2d 148, 156-57 (1st Cir. 1989) (no abuse of discretion in admitting lay opinion testimony that substance was cocaine where lay witness based opinion on past extensive personal experience with cocaine and personal observations); United States v. Osgood, 794 F.2d 1087, 1095 (5th Cir. 1986) (identification of controlled substance as cocaine sufficiently established through testimony of lay witness who had previously used cocaine, was familiar with effects, had ingested the substance at issue, and concluded it produced euphoric feeling similar to that previously experienced); United States v. Sweeney, 688 F.2d 1131, 1145-46 (7th Cir. 1982) (lay witness qualified to testify as to identity of drug based on prior use and knowledge of particular drug, sampling of substance at issue, and conclusion that effect of

-3-

substance was similar to prior experience with that particular drug); Weaver v. United States, 111 F.2d 603, 606 (8th Cir. 1940); Pennacchio v. United States, 263 F. 66, 67 (2d Cir. 1920). In virtually all of these cases, the courts have relied on the lay witness' past experiences with and personal knowledge of the substance at issue in deciding to allow the witness to offer opinion testimony. See, e.g., Paiva, 892 F.2d at 157 ("Although a drug user may not qualify as an expert, he or she may still be competent, based on past experience and personal knowledge and observation, to express an opinion as a lay witness that a particular substance perceived was cocaine or some other drug.").

Of the three witnesses, William clearly had the most extensive personal experience with crack cocaine. He testified he had never used crack cocaine, but had been exposed to it "[i]n school, stuff like that" for "[m]aybe a year." Record VII at 107. He could not state the specific number of occasions he had seen it or had been around it. He did not describe the physical appearance of crack cocaine, but he did testify he had sold approximately $5,000 worth of crack cocaine given to him by Jackson in the ten days following his escape from the juvenile detention facility and was familiar with the sizes in which it was typically sold.

Although this is a close question, I conclude the district court did not abuse its discretion in allowing William to offer his opinion concerning the identity of the substance. Unlike most of the lay witnesses in the above-cited cases, William

-4-

was not an experienced crack cocaine user. However, given the fact he had sold a significant amount of crack cocaine, I conclude he had sufficient personal experience with the substance to offer a rational opinion based on his observations.

In contrast to William, Jayson and Jerry had little if any experience with crack cocaine. Jayson testified he had not seen crack cocaine prior to receiving it from Jackson in the exchange at issue in Count 5. Jerry testified he had seen and smelled crack in Jackson's motel room, but admitted he had no experience with it prior to escaping from the juvenile detention facility in March 1996. Jerry did not explain how he knew the substance he saw and smelled in Jackson's motel room was crack cocaine. I conclude Jayson and Jerry lacked sufficient experience with crack cocaine to enable them to link their perceptions to the opinions offered at trial concerning identity of the substance given to them by Jackson. See 29 Wright & Gold, supra § 6254 at 138 ("disputes over whether a lay opinion is rationally based on perception initially must focus on the validity of the proposition that the witness used to link perception to his opinion"). Accordingly, I conclude Jayson's and Jerry's opinions were inadmissible under Rule 701 and the court abused its discretion in concluding otherwise.

The question then becomes whether the district court's error in allowing Jayson and Jerry to offer their opinions was harmless. United States v. Cass, 127

F.3d 1218, 1225 (10th Cir. 1997) ("A trial court's admission of inadmissible evidence will disturb a defendant's conviction only if the error is not harmless."), cert. denied 118 S. Ct. 1101 (1998). Because the error did not rise to the level of constitutional error, I review the record de novo, United States v. Scroger, 98 F.3d 1256, 1261 (10th Cir. 1996), cert. denied 117 S. Ct. 1324 (1997), and apply the following standard:

> If, when all is said and done, the conviction [*sic*] is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. But *if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.*

Kotteakos v. United States, 328 U.S. 750, 764-65 (1946) (emphasis added) (internal citation omitted). It is important to emphasize "this is not a sufficiency of the evidence test," and "the government has the burden of proving that the non-constitutional error was harmless." Scroger, 98 F.3d at 1261.

Count 5 charged defendants with unlawfully distributing crack cocaine in exchange for some of the stolen firearms. To find defendants guilty, the jury was instructed it had to find, in pertinent part, defendants knowingly and intentionally distributed crack cocaine and defendants knew at the time of the distribution that

the substance distributed was crack cocaine.  The government's proof concerning

identity of the substance at issue was based entirely on the three juveniles'

testimony.  *In particular, Jayson and Jerry were the only witnesses who offered*

*direct evidence of the exchange of an illegal substance for stolen firearms.*

William testified Jackson generally obtained money by selling crack.  He testified

he saw Jayson with approximately $50 worth of crack on the night Jackson was

alleged to have exchanged crack for stolen firearms.  However, he did not explain

the appearance of the substance possessed by Jayson.  There was no other

testimony concerning the characteristics of crack cocaine (its general appearance,

its use, or its effect on users).  Thus, there was no evidence that would have

allowed the jury to form its own opinion as to the identity of the substance based

upon the admissible perceptions of Jayson and Jerry.  As they could not opine that

the substance was crack cocaine, the only admissible portion of their testimony

was their description of how the substance looked and how it made them feel

when they ingested it.

I conclude admission of Jayson's and Jerry's lay opinions was reversible

error.  If I were applying a sufficiency of the evidence standard, I would conclude

William's testimony was sufficient to support the jury's verdicts on Count 5.

However, under the Kotteakos harmless error standard, I cannot say with fair

assurance that the jury's verdict was not substantially swayed by Jayson's and

Jerry's inadmissible opinion testimony.  I would reverse defendants' convictions on Count 5,  remand for new trial on Count 5, and affirm the balance of defendants' convictions.