**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jesus MARTINEZ, Defendant–Appellant.**

**No. 90–1037.**

United States Court of Appeals,
Tenth Circuit.

July 8, 1991.

Robert Justin Driscoll, Denver, Colo., for defendant-appellant.

Robert D. Clark, Asst. U.S. Atty., Denver, Colo. (Michael J. Norton, U.S. Atty., with him on the brief), for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, BARRETT and McKAY, Circuit Judges.

HOLLOWAY, Chief Judge.

Defendant-appellant Martinez was found guilty by a jury of distribution of cocaine and aiding and abetting in the distribution of cocaine (21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2), and conspiracy to distribute cocaine (21 U.S.C. § 846). On appeal, Martinez challenges two evidentiary rulings of the district judge who admitted in evidence certain items seized at two homes in the Denver, Colorado area, including money found on the person of one individual. Martinez contends that the judge abused her discretion under Fed.R.Evid. 403 in concluding that the probative value of this evidence, which included one-half pound of cocaine, a semiautomatic MAC–11 submachine gun, and large amounts of cash, was not substantially outweighed by its prejudicial effect. We affirm.

I

Martinez' arrest and conviction stem from an undercover drug operation carried out in the summer of 1989 by the Drug Enforcement Administration (DEA). Posing as a drug dealer from Wyoming, DEA Special Agent Montoya made two separate purchases in July 1989 of one ounce of cocaine from Ruben Romero (a co-defendant) at Bubba's Restaurant in Commerce City, Colorado. Following these purchases, Agent Montoya commenced discussions with Romero regarding the purchase of larger quantities of cocaine. Romero indicated that he had a supplier of cocaine, and that he was able to obtain kilogram quantities of the drug. Agent Montoya arranged to purchase two kilograms from Romero. On August 15, 1989 at approximately 3:00 p.m., Montoya met Romero at Bubba's to discuss the two-kilogram purchase. At the meeting, Romero told Montoya that he did not have the cocaine with him and that he would have to go get it. Romero said that

he would deliver the cocaine to Montoya at approximately 4:00 p.m. at a nearby motel.

Romero left the meeting at Bubba's and went to his home in Denver. Montoya contacted him there by telephone at approximately 3:30 p.m., and Romero indicated that he was on his way to get the cocaine. Romero then drove to the home of Martinez in Denver. Together, in Romero's 1965 Dodge Dart sedan, the two traveled to a spot near the suburb of Lakewood, Colorado. There Romero was let out of the car, and Martinez proceeded alone to a home at 1330 Chase Street in Lakewood.

Martinez entered the Chase Street home and remained inside for five to ten minutes, and then returned to Romero's car. A DEA Agent had him under surveillance at the time. From what the Agent could observe one-half a block away, Martinez did not exit the home carrying any items. However, the Agent's vision of the area below Martinez' waist was allegedly obstructed by Romero's car. Martinez drove the car back to the general area where he had dropped off Romero, who was then proceeding east on foot. Traveling east as well, Martinez apparently came within eyesight of Romero but did not stop to pick him up. Soon thereafter, a black Mustang, which had been parked on a side street, began to follow Martinez. Martinez made a U-turn and, without exiting the car, waved and spoke briefly with the driver of the Mustang. Then he proceeded west to a gas station where he met Romero. Romero had arrived at the station on foot.

Romero assumed operation of his car and, alone, drove to the motel to meet Montoya. He arrived at approximately 4:30 p.m. When he presented Montoya with the promised two kilograms of cocaine, Romero was arrested. Martinez was also arrested soon thereafter. He was some three miles away from the motel, riding in a black Mustang which had picked him up at the gas station. The driver of the Mustang was Nicholas Meza, the lessee of the home at 1330 Chase Street.

That night law enforcement officers obtained a warrant to search the Chase Street home. They found there $69,000 in cash, a semiautomatic MAC–11 submachine gun, one-half pound of cocaine, and a triple-beam scale. The officers also conducted a consent search that night of Martinez' home in Denver and found there $6,730 in cash. A visitor to Martinez' home at the time of the search, Oscar Mendoza, consented to a search of his person and the officers discovered $1,980 on him.[1]

## II

Martinez was charged along with Romero with conspiring to distribute cocaine on or about August 15, 1989, and distributing and aiding and abetting in the distribution of cocaine on or about the same date. In addition, Romero was charged with two counts of distribution of cocaine relating to his two sales in July to Agent Montoya. Romero pleaded guilty to the three distribution counts, and the government dismissed the conspiracy count as to him. Accordingly, Martinez stood for trial alone.

At trial, Romero testified for the government.[2] He said that Martinez supplied him

---

**1.** There are discrepancies in the briefs with respect to the amount of cash discovered in the search of the Chase Street home. *Compare* Brief of Appellant at 2 ($69,000) *with* Brief of Appellee at 13 ($69,315). And they persist with respect to the amount of cash discovered on the person of Oscar Mendoza. *Compare* Brief of Appellant at 3 ($1,988) *with* Brief of Appellee at 14 ($1,980).

Unlike similar discrepancies in the briefs, the citations to the record do not dispel the confusion. *See, e.g.,* V R. 332 (testimony of DEA Special Agent John Flaherty) (describing the money seized from Chase Street as amounting to "just under $70,000"); IV R. 223 (testimony of DEA Special Agent Daniel Topper) (noting

that he discovered on the person of Mendoza "in excess of $1,900 in cash"). We do not find these differences in numbers to be material to our determination of the issues in this case. Because the briefs reflect that at least $69,000, and $1,980 were discovered in the search of the Chase Street home and the person of Mendoza, respectively, we make use of these figures here.

**2.** Romero did not testify under a plea agreement. IV R. 240. The government obtained his testimony through a compulsion order issued by the district judge under 18 U.S.C. § 6003. The order immunized Romero from further prosecution for any crimes related to his three cocaine distributions to Agent Montoya. I R.,

with the two kilograms of cocaine that he distributed to Agent Montoya. More specifically, Romero testified that Martinez obtained the cocaine on August 15, after letting Romero out of his Dodge, and brought the cocaine back to him. He explained that Martinez traveled alone to get the cocaine because Martinez' associates, who were in possession of the cocaine, did not know Romero well and were wary of having contact with him.

Over Martinez' objection, the government also sought to introduce in evidence the various items seized from the Chase Street home and the $8,710 seized from Martinez' home and the person of Oscar Mendoza, the visitor. The government argued that the jury should be allowed to infer from the presence at the Chase Street home of the cocaine, machine gun, cash, and scales (what it called the "standard tools of drug trafficking") that the Chase Street home was a "stash house"—that is, "a house where drugs were stored and out of which drugs were delivered and money was taken." IV R. 106, 112–13.

In view of Martinez' stop at the Chase Street home, the government reasoned that this inference would support its theory that Martinez was the supplier of the two kilograms of cocaine at issue. The jury could find, said the government, that the Chase Street home was the source of the cocaine, as it was the only significant stop Romero's car made after he informed Agent Montoya at Bubba's that he was departing to get the drug. Also, apparently relying on the alleged drug-trafficking association of large sums of cash, the government argued that the $6,730 seized from Martinez' home and the $1,980 found on Oscar Mendoza were admissible, relevant evidence.

■ In oral rulings from the bench, the district judge generally accepted the government's arguments and admitted all the contested evidence. As to the Chase Street items, the judge specifically found that there was a sufficient connection between the Chase Street home and Martinez to admit these items in evidence based on Martinez' five to ten minute visit to the home. However, she ruled that the items were only admissible for the limited purpose of shedding light on "the nature of th[e] home." IV R. 115–16. And, when the items were initially admitted, the court gave the jury an express limiting instruction to this effect.[3] Id. at 148. As for the cash seized from Martinez' home and the person of Oscar Mendoza, the judge noted that in cases involving suspected drug activity such evidence is admissible, and she found that there had been a sufficient showing by means of circumstantial evidence that Martinez was involved in drug dealings. Further, she said that inferences could be drawn from the fact that a person carrying large sums of cash is visiting an alleged drug dealer, and that Martinez was free to call Mendoza to explain what he intended to do with the money. Martinez, however, did not call Mendoza to testify.

---

Doc. 4, at 2; Brief of Appellee at 21. Romero, however, was not entirely a reluctant witness. At the time he testified, Romero had not been sentenced, and his counsel had asked the government to consider seeking some form of reduction in his possible sentence based on his testimony. IV R. 242–43. Romero acknowledged in open court that he hoped that his testimony would lead to a reduction in his sentence. Id. at 271, 299.

3. Although the subject of a limiting instruction with regard to the Chase Street evidence was initially raised by the district judge, Martinez concurred in the giving of such an instruction. IV R. 110, 113. On appeal, Martinez suggests that because the judge did not repeat the limiting instruction in its final charge to the jury, in addition to giving it when the evidence was initially admitted, the limiting instruction may not have been adequate to cure any prejudice flowing from the Chase Street evidence.

Ordinarily it is a litigant's responsibility to request a limiting instruction, and Martinez failed to do so with respect to the final charge. Accordingly, Martinez' objection to the adequacy of the limiting instruction regarding the Chase Street evidence is not well taken. See United States v. Record, 873 F.2d 1363, 1376 (10th Cir.1989); United States v. Cuch, 842 F.2d 1173, 1177 (10th Cir.1988). Accord United States v. Adams, 759 F.2d 1099, 1109 (3d Cir.), cert. denied, 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985). We note, on the subject of the cash seized from Martinez' home and the person of Oscar Mendoza, that there is no indication in the record that Martinez requested a limiting instruction at any point in the proceedings, and none was given by the district judge.

Martinez did testify on his own behalf. He denied selling illegal drugs, and specifically refuted Romero's account of the events of August 15.[4] Also, Martinez testified that, while they were both in jail pending trial, Romero told him that he would arrange for Martinez' release in exchange for money. Martinez allegedly explained to Romero that he did not have any money. Moreover, Martinez testified regarding the source of the money seized from his home. He noted that he was in the business of buying and selling cars, and said that the seized cash had been forwarded to him by an associate to buy two car engines.

The jury found Martinez guilty on the conspiracy and distribution charges. He was sentenced to concurrent prison terms of 78 months, a four-year term of supervised release, and special assessments amounting to $100. This appeal followed.

### III

■ Under Fed.R.Evid. 403, a trial judge must determine whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice. Evidence is not unfairly prejudicial simply because it is damaging to an opponent's case. *See United States v. Chalan*, 812 F.2d 1302, 1308 (10th Cir.1987); *Fitzgerald v. United States*, 719 F.2d 1069, 1071 (10th Cir.1983). Rather, the evidence must have "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed.R. Evid. 403 advisory committee's note. A trial judge's discretion under Rule 403 in balancing the probative value of evidence against its potential prejudicial effect is

broad, and reversal is appropriate only on a showing of abuse. *See United States v. Sullivan*, 919 F.2d 1403, 1417 (10th Cir. 1990); *United States v. Cuch*, 842 F.2d 1173, 1175 (10th Cir.1988).

### A

■ Martinez first contends that the district judge abused her discretion under Rule 403 by admitting in evidence the items seized at 1330 Chase Street, specifically, $69,000 in cash, a semiautomatic MAC-11 submachine gun, one-half pound of cocaine, and a triple-beam scale.

He says that the Chase Street evidence was of no probative value because no connection was established between this evidence, the charged offenses, and him, yet the evidence was highly prejudicial. Martinez notes that the government did not charge him with any offense involving the firearm, the cash, or the half pound of cocaine taken from the house. Nor was there any allegation that Martinez was involved in a conspiracy with the occupants of the Chase Street home. Martinez underscores the fact that he was only inside the home for five to ten minutes. He notes that the government failed to present any testimony of occupants of the Chase Street home indicating that he even knew these items were present, and that government witnesses acknowledged that the items were hidden. *See* Brief of Appellant at 6. Lastly, Martinez points out that the government presented no witness who observed him exiting the home with two kilograms of cocaine, despite the fact that an officer had him under surveillance.[5]

---

**4.** Martinez said that Romero sold meat products, and on August 15 he met Romero to pick up an order of lard. Romero allegedly asked Martinez to accompany him in his car and Romero would deliver the lard to him. In Lakewood, Romero allegedly told Martinez that he wished to leave the car in Martinez' control and depart on foot to tell nearby friends of his upcoming trip to Mexico.

Romero was said to have asked Martinez to proceed to 1330 Chase Street and pick up some irons for him. Martinez allegedly entered the Chase Street home and made an unsuccessful attempt to discover the whereabouts of the irons (the exact nature of which he was uncertain),

and then left. He later reunited with Romero, who departed in his car alone. At that point, to get home, Martinez said he accepted a ride with a person driving a black Mustang. Soon thereafter, he was arrested. *See* V R. 405–13.

**5.** Martinez further contends that he was prejudiced by the admission of the Chase Street evidence because he was compelled to put on an expert witness in rebuttal to refute misguided inferences of guilt flowing from his presence at the Chase Street home. The expert's testimony was intended to demonstrate that it was unlikely that Martinez could have exited the Chase Street home with the cocaine, undetected by the

We find no abuse of discretion. In other circuits, courts have often held in the context of drug distribution offenses that items like those at issue here—firearms, large sums of cash, weighing scales, and uncharged quantities of illegal drugs—are sufficiently probative to warrant admission under Fed.R.Evid. 403. *See, e.g., United States v. Nixon,* 918 F.2d 895, 904 (11th Cir.1990) (firearms); *United States v. Bernal,* 719 F.2d 1475, 1477–78 (9th Cir.1983) (weighing scales and $8,600 in cash); *United States v. Miroyan,* 577 F.2d 489, 494–95 (9th Cir.) (firearm and small quantity of marijuana), *cert. denied,* 439 U.S. 896, 99 S.Ct. 258, 58 L.Ed.2d 243 (1978).[6] *But cf. United States v. Chen,* 629 F.Supp. 263, 272 (S.D.N.Y.1986) (noting that defendant's possession of firearms was "at best marginally probative of his ability to engage in narcotics trafficking").

Such items have generally been viewed as "tools of the trade"—that is, means for the distribution of illegal drugs. *See, e.g., United States v. Wiener,* 534 F.2d 15, 18 (2d Cir.), *cert. denied,* 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976). Accordingly, they have been held to be probative of an accused's participation in the drug distribution business and, more specifically, his or her participation in the charged distribution offenses. *See United States v. Savinovich,* 845 F.2d 834, 837 (9th Cir.), *cert. denied,* 488 U.S. 943, 109 S.Ct. 369, 102 L.Ed.2d 358 (1988); *United States v. Cresta,* 825 F.2d 538, 554 (1st Cir.1987), *cert. denied,* 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988); 1 C. Torcia, *Wharton's Criminal Evidence* § 96, at 351–52 (14th ed. 1985) (noting that an accused's possession of a weapon or implement "suitable to the commission of the crime charged ... is always a proper ingredient of the case for the prosecution").

It is basically immaterial to the admissibility inquiry in cases like these whether the accused has been charged with an offense directly related to his or her possession of a "tool of the trade." *See United States v. Ariza–Ibarra,* 605 F.2d 1216, 1224–25 (1st Cir.1979). In particular, in admitting firearms and large amounts of cash, courts have recognized the high level of violence that is not uncommonly associated with the drug distribution business and the prevalence in this business of large-scale cash transactions.[7] *See United States v. Wood,* 834 F.2d 1382, 1386 (8th Cir.1987); *United States v. Marino,* 658 F.2d 1120, 1123 (6th Cir.1981).

We are persuaded by the rationale of these cases. Indeed, we have recently de-

---

Agent on surveillance. V R. 378–79; Brief of Appellant at 9. According to Martinez, in part this rebuttal testimony had the negative effect of highlighting the Chase Street evidence, which, due to its limited probative value, should not have been before the factfinder in the first place. Because we conclude below that the factfinder could properly consider the Chase Street evidence, we find no foundation for Martinez' assertion that he was prejudiced by having to rebut it.

**6.** *See also United States v. Newton,* 891 F.2d 944, 948–49 (1st Cir.1989) (large-scale cash purchases); *United States v. Savinovich,* 845 F.2d 834, 837 (9th Cir.) (firearm and weighing scales), *cert. denied,* 488 U.S. 943, 109 S.Ct. 369, 102 L.Ed.2d 358 (1988); *United States v. Cresta,* 825 F.2d 538, 554 (1st Cir.1987) (firearm), *cert. denied,* 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988); *United States v. Dempewolf,* 817 F.2d 1318, 1322 (8th Cir.) ($720 in cash), *cert. denied,* 484 U.S. 903, 108 S.Ct. 245, 98 L.Ed.2d 203 (1987); *Adams,* 759 F.2d at 1109 (firearm); *United States v. Tramunti,* 513 F.2d 1087, 1105 (2d Cir.) ($967,450 in cash), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975).

**7.** In upholding the admission of evidence of the possession or expenditure of large sums of cash, some courts have characterized drug distribution offenses as crimes where "pecuniary gain is the usual motive for or natural result of" their perpetration. *United States v. Chagra,* 669 F.2d 241, 256 (5th Cir.), *cert. denied,* 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982); *see United States v. Wood,* 834 F.2d 1382, 1386 (8th Cir. 1987). *Cf. United States v. Jackskion,* 102 F.2d 683, 684 (2d Cir.) (a bootlegging case), *cert. denied,* 307 U.S. 635, 59 S.Ct. 1032, 83 L.Ed. 1517 (1939). As such, drug distribution offenses are akin to larceny and similar crimes, where it has been held that the sudden acquisition of money by an accused renders the view that the money was acquired dishonestly "a natural and prominent hypothesis." 1A J. Wigmore, *Evidence* § 154, at 1764 (1983); *see Chagra,* 669 F.2d at 256. *Cf. Jackskion,* 102 F.2d at 684. While we do not quarrel with this characterization of drug distribution offenses, our focus here is more precisely on the "cash-and-carry" nature of the drug trade. *United States v. McDonald,* 933 F.2d at 1522 (10th Cir.1991).

scribed such items in similar terms. *See United States v. McDonald,* 933 F.2d 1519, 1522 (10th Cir.1991) (noting that a loaded pistol, a single-edge razor blade, and a pager can "best be described as a drug dealer's tools of trade," and calling the drug trade "a cash-and-carry business"). Moreover, the view of this case is consistent with our decision in *Fitzgerald, supra.* There, we noted that weighing scales and a large quantity of narcotics, which were seized following the arrest of defendant, supported the proposition that defendant was engaged in narcotics distribution, and specifically held that the admission of the seized narcotics was not improper under Rule 403. 719 F.2d at 1070–71. *See also United States v. Mabry,* 809 F.2d 671, 687 (10th Cir.) (finding no abuse of discretion under Fed.R.Evid. 404(b) in the admission of evidence of defendant's purchase and possession of a large quantity of gold and silver), *cert. denied,* 484 U.S. 874, 108 S.Ct. 33, 98 L.Ed.2d 164 (1987).

In challenging the admission of the submachine gun, Martinez relies on the Ninth Circuit's decision in *United States v. Green,* 648 F.2d 587 (9th Cir.1981) (per curiam). We do not believe, however, that *Green* suggests a different result. There the court held that it was error under Rule 403 to admit evidence of defendant's possession of firearms, noting that weapons are generally held to be inadmissible where they are unrelated to the charged offenses and the charged offenses are not dependent on their use or ownership. 648 F.2d at 594–95. However, the offenses in *Green* were a conspiracy to obstruct justice, to make false statements, and to violate the civil rights of United States citizens. *Id.* at 589. Here, on the contrary, the offenses at issue involve the distribution of illegal drugs. Violence is not an uncommon feature of the drug trade and weapons are often viewed as necessary tools to facilitate it. Indeed, in drug distribution cases, the Ninth Circuit has allowed the admission of evidence of firearms under Rule 403. *See Savinovich,* 845 F.2d at 837; *Miroyan,* 577 F.2d at 495. Here Martinez' reliance on *Green* is misplaced.[8]

Furthermore, we find little substance in Martinez' position that no connection was established between the Chase Street evidence and him. The government did not allege nor seek to prove that Martinez owned the Chase Street home or that he exercised dominion and control over all of its contents. Instead, in introducing the Chase Street items in evidence, the government sought to establish a key point in support of its evidentiary hypothesis that Martinez acquired the two kilograms of cocaine from the Chase Street home and supplied it to Romero—namely, that the Chase Street home was a "stash" house. Generally speaking, this was not improper. *Cf.* 1 J. Weinstein & M. Berger, *Weinstein's Evidence,* ¶ 401[05], at 401–33 (noting that "[e]vidence that can assist the trier of fact in evaluating the validity of an evidential hypothesis may be admissible even though it may not directly relate to a consequential fact").

It was Martinez that lent probative force to this key point by his stop at the Chase Street home. To be sure, the stop was a brief one of five to ten minutes. However, we feel that it was permissible to draw the inference that this period was sufficient for Martinez to acquire the two kilograms of cocaine. Accordingly, we believe that no further showing of Martinez' contact with the home (such as his involvement in a

---

8. We note that our decision in *United States v. Warledo,* 557 F.2d 721 (10th Cir.1977), is distinguishable for similar reasons. In *Warledo,* we held that it was error to admit an automatic rifle in evidence, reasoning in part that the rifle was not relevant to the crimes charged. *Id.* at 725–26. The offenses at issue were arson, extortion, and possession of an incendiary device. Although these offenses may not be free from violence, in *Warledo* it is clear that we did not perceive them as closely associated with the use of firearms and other weapons, in contrast to the situation with drug distribution offenses. *See United States v. Marino,* 658 F.2d 1120, 1123 n. 3 (6th Cir.1981) (noting that "the defendant in *Warledo* did not need the weapons to protect his contraband as in the drug conspiracy cases"); 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 401[10], at 401–71 (1989) (citing *Warledo,* and noting that courts have held that weapons not used in the charged crime should be excluded where, generally, the offense does not "suggest a clear possibility of the need for dangerous weapons").

conspiracy with its occupants) was necessary to support the admission of the evidence. Lastly, there was evidence suggesting a plausible explanation for why the government Agent did not observe Martinez removing the cocaine from the Chase Street home, if in fact he did so (*i.e.*, the obstruction of the Agent's view by Romero's car). Accordingly, we uphold the district judge's admission of the Chase Street evidence.

### B

■ Martinez also contends that the district judge abused her discretion under Rule 403 in admitting evidence of the $8,710 in cash seized from his home and the person of Oscar Mendoza. He notes that the government failed to establish that the $8,710 in cash was fruit of the charged offenses and, in this connection, underscores the fact that in the August 15 transaction involving Montoya, no money changed hands. Further, Martinez analogizes the introduction of the $8,710 in evidence to the admission of bad character materials, which is prohibited, because the jury may have been led to believe that since it was unlikely that a person in his financial position could possess or be associated with that much money, he must be guilty of the charged offenses.[9]

■ Again we find no abuse of discretion. Initially, we reject the notion that the government must establish that seized cash was the fruit of the particular drug distribution offenses at issue for that cash to be admissible under Rule 403. As noted in relation to the Chase Street evidence, large-scale cash transactions are a prevalent feature of the drug distribution business. Accordingly, evidence of a defendant's association with sizeable amounts of cash may be probative of his or her involvement in that business, and thus bear on the question of defendant's guilt of the charged drug distribution offenses. *See, e.g., United States v. Newton*, 891 F.2d 944, 948–49 (1st Cir.

1989). As the Eighth Circuit noted in rejecting a similar contention, "it is not necessary that every piece of evidence admitted should be sufficient by itself to prove the crime alleged." *Wood*, 834 F.2d at 1386. Furthermore, the possibility that the seized cash was the product of entirely lawful activities goes to the weight of the evidence, not its admissibility. *See Newton*, 891 F.2d at 949.

■ To be sure, absent other evidence of an accused's participation in the charged distribution offenses, large quantities of cash may have little (if any) probative value. *See United States v. Chagra*, 669 F.2d 241, 256 (5th Cir.), *cert. denied*, 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982); *Tramunti*, 513 F.2d at 1105. In the instant case, however, the government did adduce other evidence that tended to show Martinez' participation in the charged offenses. Accordingly, there was a foundation in the evidence for the admission of the $8,710.

In argument, Martinez draws heavily on the analysis in *United States v. Zarintash*, 736 F.2d 66 (3d Cir.1984). There, in a drug distribution case, the court concluded that it was error to admit evidence of $32,960 in cash seized from defendant's apartment. The trial judge had admitted the evidence under a "tools of the trade" rationale, reasoning that the possession of such large sums of cash was a necessary feature of the drug distribution business. 736 F.2d at 71. In finding error, the court in *Zarintash* noted that the money was seized from defendant's apartment nearly one year after the charged distribution conspiracy ended. Assuming, without deciding, that the possession of money could be probative of participation in a drug conspiracy, the court of appeals ruled that the defendant's possession of the $32,960 *at that time* was not sufficiently probative to justify its admission as to defendant's alleged involvement one year earlier in the terminated conspiracy. In fact, the court said that,

---

**9.** Martinez also objects to the admission of the $8,710 on the ground that the government has not charged him with any offenses that are based on the receipt of money. As noted in

connection with the Chase Street evidence, this objection is without merit. *See United States v. Ariza–Ibarra*, 605 F.2d 1216, 1224–25 (1st Cir. 1979).

absent any ties to the conspiracy, the evidence was akin to proscribed bad character evidence. *Id.* at 71–72.[10]

Whatever the merits of the *Zarintash* analysis, which focuses on the proximity in time between the charged offenses and the possession of the money, we are not persuaded that admission of the $8,710 was in error here. In contrast to *Zarintash,* the seizure of the $8,710 was closely tied in temporal terms to Martinez' involvement in the charged distribution offenses. Specifically, the government presented evidence that tended to show Martinez' participation in the offenses on August 15, 1989. And, on that same day, law enforcement officers seized the $8,710 in cash from Martinez' home and the person of Oscar Mendoza. Instead of providing a speculative foundation for the jury's verdicts of guilt like bad character evidence, under the "tools of the trade" rationale, the $8,710 in cash was probative with respect to the commission of the charged offenses. Accordingly, we find Martinez' reliance on *Zarintash* to be misplaced. We hold that the admission of evidence regarding the $8,710 was not error.

**AFFIRMED.**

---

**10.** The Third Circuit in *Zarintash* looked to *Williams v. United States,* 168 U.S. 382, 18 S.Ct. 92, 42 L.Ed. 509 (1897) for support. There, in a prosecution for extorting money from Chinese immigrants, the Supreme Court held that the trial court erred in admitting in evidence affidavits attesting to defendant's financial condition and bank books tending to show that deposits were made on defendant's behalf during the period of the alleged extortion, as there was no "necessary or natural connection" between this evidence and the charged offenses. 168 U.S. at 395–97, 18 S.Ct. at 96–98. The Court observed:

> The manifest object and the necessary effect of this evidence was merely to give color to the present charges, and to cause the jury to believe that the accused had in his possession more money than a man in his condition could have obtained by honest methods, and,

*therefore,* he must be guilty of extorting the two sums in question.

*Id.* at 396, 18 S.Ct. at 97 (emphasis in original).

We note that a number of circuit courts have concluded that *Williams* did not "establish a general rule of evidence but instead simply constituted a narrow ruling on the particular facts of that case." *Chagra,* 669 F.2d at 256 n. 21; *see Ariza–Ibarra,* 605 F.2d at 1225 n. 11; *Tramunti,* 513 F.2d at 1105 n. 21; *Jackskion,* 102 F.2d at 684. *See also* 1A J. Wigmore, *Evidence* § 154, at 1764 n. 3 (1983) (severely criticizing the reasoning in *Williams* ). In any event, we believe that admission of the $8,710 was not improper under *Williams* because a "necessary or natural connection" was established here between the money, the charged cocaine distribution offenses, and Martinez. *See Chagra,* 669 F.2d at 256 n. 21.