**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 20 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DRUCILLA JEAN BAKER and
TEDDY LEROY BAILEY,

Defendants-Appellants.

Nos. 97-6311 & 97-6312
(D.C. No. 97-CR-28-R)
(W.D. Okla.)

---

**ORDER AND JUDGMENT** *

---

Before **TACHA** and **McKAY** , Circuit Judges, and **BROWN** ,** Senior District
Judge.

---

After examining the briefs and appellate record, this panel has determined

unanimously to grant the parties' request for a decision on the briefs without oral

---

\* This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

\*\* Honorable Wesley E. Brown, Senior District Judge, United States District
Court for the District of Kansas, sitting by designation.

argument.  <u>See</u> Fed. R. App. P. 34(f); 10th Cir. R. 34.1.9.  The case is therefore ordered submitted without oral argument.

A jury convicted Teddy Leroy Bailey and Drucilla Jean Baker of one count of conspiracy to possess with intent to distribute and to distribute methamphetamine, three counts of possession with intent to distribute methamphetamine, and two separate counts each of distribution of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846.  The jury also convicted Mr. Bailey of two counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(I) and one count of money laundering in violation of 18 U.S.C. § 1957.  The district court sentenced Mr. Bailey to 286 months in prison and Ms. Baker to 210 months in prison.  Both defendants appeal their convictions and sentences.  We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), and affirm both defendants' convictions and sentences.

**I Background**

The investigation into this case began when Oklahoma City police were advised that Mr. Bailey and an individual named Rocky Miller, a/k/a Rocky Rothrock, were distributing large amounts of methamphetamine in the Oklahoma City area.  Ms. Baker lived with Mr. Bailey at a house in Mustang, Oklahoma. The evidence the government presented against them consisted primarily of the

testimony of coconspirators and their own incriminating statements to law enforcement officials. [1] The highlights of this evidence are summarized below.

Tammy Baker, Ms. Baker's daughter, testified that she began buying methamphetamine from Miller in October or November 1993. She was present in early 1994 when Mr. Bailey first met Miller, as a result of Mr. Bailey working on Miller's car. She said that on most occasions when she went to defendants' house to visit, Miller was there and that Mr. Bailey and Miller eventually began talking about methamphetamine and selling it back and forth to each other. On one occasion in September or October 1994, she saw Mr. Bailey and Miller in Mr. Bailey's "office" in the house bagging up methamphetamine and, based on her prior involvement with methamphetamine, estimated the quantity at five pounds. She stated that three or four weeks earlier she had seen Mr. Bailey in his office weighing a pound of methamphetamine that Miller had brought to him and that Mr. Bailey had told her that he made $2000 to $3000 from selling one to two pounds of methamphetamine. On another occasion, she also saw what Mr. Bailey said was a five-pound package of methamphetamine that had been delivered to the house. Tammy Baker stated that on two or three occasions she obtained one-sixteenth ounce quantities of methamphetamine from Mr. Bailey, which she

---

[1]    Rocky Miller was a fugitive at the time of trial and apparently has never been prosecuted.

sold to people at clubs. In early to mid 1995, she helped Mr. Bailey, her mother, Miller and Miller's girlfriend count $175,000 in cash in the living room of defendants' house. She also observed Miller give Mr. Bailey $20,000 in cash and ask him to buy cashier's checks, which Miller intended to use to purchase a mobile home.

Brandon Huntley testified that he met Mr. Bailey in the spring of 1995 and that over the next nine months he purchased one-sixteenth to one-half ounce quantities of methamphetamine from Mr. Bailey about twice a week. On one occasion Ms. Baker delivered an eighth of an ounce of methamphetamine to his apartment. He saw five pounds of methamphetamine at defendants' house in May 1995 that had been delivered by Federal Express. In the summer of 1995, he helped Mr. Bailey count approximately $165,000 in cash. He also testified that Mr. Bailey had several firearms, that Mr. Bailey generally carried a firearm during their drug transactions, and that he purchased a firearm from Mr. Bailey.

Patsy South met Mr. Bailey as a result of her long-term friendship with Ms. Baker. She said that she purchased methamphetamine from Mr. Bailey at defendants' house on five or six occasions and at other locations on three to five occasions. On a number of occasions she made the arrangements to buy the methamphetamine with Ms. Baker, and when she purchased the drug at locations other than the house, Ms. Baker was with Mr. Bailey.

Linda Stumpf testified that she began purchasing methamphetamine from Ms. Baker in December 1994 or January 1995 when they both worked at a truck stop. She stated that she continued to purchase an eighth to a quarter ounce of methamphetamine from Ms. Baker and eventually Mr. Bailey, often at defendants' house, on a weekly basis for the next six or seven months. She observed firearms at the house and stated that a friend traded a pistol to Mr. Bailey for some methamphetamine.

Gretchen Howland testified that she also purchased methamphetamine from Ms. Baker when they worked together at the truck stop. She also purchased the drug from Mr. Bailey at defendants' house.

Steve Dance testified that he met Mr. Bailey in early 1995 through Brandon Huntley and that he purchased about one-sixteenth of an ounce of methamphetamine from Mr. Bailey weekly for about six months. Dance said that Mr. Bailey told him he was selling pounds of methamphetamine a week, and Mr. Bailey once showed him a suitcase full of money. Dance said that he saw firearms all over defendants' house and that Mr. Bailey sometimes carried a gun when conducting business.

Bank records and testimony showed that Mr. Bailey purchased cashier's checks in the amounts of $5,000, $11,000 and $10,000 and that the checks were used by Miller to purchase a mobile home.

Detective Sargent Dennis Haskins, an Oklahoma City police officer, testified that, before being arrested, Mr. Bailey had stated that Miller had given him the money to purchase the cashier's checks, but that he did not know what Miller planned to use the checks for. He also said that he knew Miller was selling methamphetamine out of his house while Miller was staying with him, that they had argued over Miller's selling drugs, and that Miller had tried to talk him into selling methamphetamine, in part by showing him two briefcases containing $150,000 each and saying that Mr. Bailey was missing out on that kind of money.

On the day Mr. Bailey was arrested, Haskins talked to Ms. Baker, who had not yet been arrested. She stated that thirteen to fifteen pounds of methamphetamine had been delivered to defendants' house and that she had sold methamphetamine to several coworkers at the truck stop including Stumpf and Howland. She stated that she observed a suitcase hidden in her attic containing approximately $155,000 that belonged to Miller. She also stated that Miller had made calls from her house to California and had told her that the methamphetamine was manufactured near Hemet, California.

After his arrest, Mr. Bailey also made statements to Haskins and other law enforcement officers. Mr. Bailey stated that he met Miller through Tammy Baker in 1993 and that Miller had asked him to sell methamphetamine, but he initially refused. He said that Miller had stayed at his house while Miller was purchasing

-6-

the mobile home and had forced him, through threats to him and his family, to purchase the cashier's checks. He stated that around August 1995, he began making deliveries of methamphetamine for and collecting money from drug sales due Miller and that Miller paid him $500 for each delivery. He accompanied Miller to California where Miller obtained an ounce of methamphetamine that he sampled. On this trip Miller showed him a briefcase containing $150,000 in cash. He said that Miller had mailed him packages of methamphetamine to his house, and that one of the packages contained ten pounds of methamphetamine. He stated that he had never delivered methamphetamine to Linda Stumpf or Gretchen Howland, but that he had done drugs with them.

In February 1997, a grand jury returned a sixteen-count indictment against Mr. Bailey and Ms. Baker. After five firearms counts against Mr. Bailey were severed, the two defendants were tried and convicted by a jury as charged on all eleven remaining counts. The district court thereafter held a sentencing hearing to determine the type and quantity of drugs for which defendants should be held accountable. The court determined that defendants were accountable for thirty-three pounds of d-methamphetamine and sentenced them accordingly.

## II Guilt Issues

A.    Denial of Motion to Suppress

Mr. Bailey challenges the district court's denial of his motion to suppress evidence obtained through execution of two search warrants, one issued by a state court to search defendants' house and a subsequent one issued by the district court to search the house and Mr. Bailey's storage unit.  He argues generally that the state warrant amounted to an improper general warrant and that because the federal warrant was based in part on evidence obtained from the state warrant, evidence obtained from the federal warrant should have been suppressed as fruit of an illegal search.  He also contends that the federal warrant was facially overbroad.

Mr. Bailey does not identify in his appellate brief what allegedly illegally seized evidence was introduced at his trial.  In its response brief, the government contends that only two items seized pursuant to the state warrant--a syringe and a bank passbook--were introduced and that no evidence seized pursuant to the federal warrant was introduced.  Mr. Bailey has not rebutted the government's contention, and based on our review of the record, that contention appears correct. We therefore need not look at the validity of the federal warrant, and turn our attention only to the state warrant.

"On appeal from the denial of a motion to suppress, we accept the trial court's findings of fact unless clearly erroneous, and we consider the evidence in the light most favorable to the government. Questions of law, including the ultimate determination of the reasonableness of a search under the Fourth Amendment, are reviewed *de novo*." United States v. Martinez-Cigarroa, 44 F.3d 908, 910 (10th Cir. 1995) (citation omitted). Mr. Bailey's challenge to the state warrant essentially contends that it is overbroad, which raises a legal question we review de novo. See United States v. Janus Indus., 48 F.3d 1548, 1554 (10th Cir. 1995). [2]

Mr. Bailey was arrested when he allegedly attempted to sell a stolen Toyota pickup to an undercover agent. The subsequently issued search warrant for his house described the property to be seized as a particular Oklahoma license tag that had been assigned to the truck, a gray truck box that the owner had said was in the truck, and the following, which is the portion of the warrant Mr. Bailey challenges:

> And articles of personal property tending to establish the identity of the person or persons in control or possession of the place or vehicle, including, but not limited to, utility company receipts, rent receipts,

---

[2]    We reject the government's argument that by failing to object to the introduction of the evidence at trial, Mr. Bailey waived the right to challenge the earlier denial of his motion to suppress, such that we would review his claim only for plain error. See Martinez-Cigarroa, 44 F.3d at 909 n.1.

> canceled mail envelopes, vehicle registration, credit card receipts, repair bills, photographs, keys, and articles of clothing[.]

R. Vol. I, Doc. 37, Ex. A. Mr. Bailey contends that the quoted language was so overbroad and lacking in particularity that it was an invalid general warrant and that, correspondingly, there was no probable cause to support issuance of such a broad warrant, citing, inter alia, Andresen v. Maryland, 427 U.S. 463 (1976), and Maryland v. Garrison, 480 U.S. 79 (1987).

The particularity requirement imposed by the Fourth Amendment on the description of things to be seized in a search warrant "prevents a general, exploratory rummaging in a person's belongings." Janus Indus., 48 F.3d at 1553 (quotation omitted). A warrant describing the items to be seized in general terms is valid as long as the description is as specific as circumstances allow and the description allows the searcher to reasonably identify the things authorized to be seized. See id. at 1554; see also United States v. Simpson, ___ F.3d ___, No. 97-5121, 1998 WL 480097, at *6 (10th Cir. Aug. 17, 1998). We conclude that the state warrant was sufficiently particular that it cannot be construed as a general warrant. The warrant authorized officers to seize items identifying who had dominion and control over premises where concededly there was probable cause for stolen property to be found. Such warrants are as particular as circumstances allow and are permissible. See United States v. McLaughlin, 851 F.2d 283, 286 (9th Cir. 1988); United States v. Alexander, 761 F.2d 1294,

-10-

1301-02 (9th Cir. 1985). We thus conclude that the district court did not err in denying Mr. Bailey's motion to suppress.

B.     Admission of evidence of firearms possession

Mr. Bailey contends that the district court erred by admitting evidence showing that he possessed firearms. The district court initially granted his motion in limine to exclude this evidence on the basis that, because it did not tend to prove any elements of the charged crimes, its prejudice would outweigh its probative value. After hearing Tammy Baker's testimony about the large quantities of methamphetamine and cash kept at the house, the district court sua sponte changed its ruling, concluding that "after hearing her testimony about cash and drugs being kept in the home, that testimony about weapons there to protect that stash, if there is such testimony, would be relevant, so I will retract my prior ruling on that." R. Vol. III at 91. Mr. Bailey contends that the evidence was not relevant under Fed. R. Evid. 401 because there was no connection between possession of firearms and the conspiracy and distribution charges against him. He further contends that, even if relevant, the evidence was unduly prejudicial because it was meant only to portray him as an armed and dangerous outlaw and thus should have been excluded under Rule 403.

As with all evidentiary rulings, we review the district court's determination of relevance and whether the probative value of the evidence is not substantially

outweighed by its prejudicial effect for an abuse of discretion.    See United States

v. Flanagan , 34 F.3d 949, 952 (10th Cir. 1994);    see also, e.g. , United States v.

Davis , 40 F.3d 1069, 1073 (10th Cir. 1994).  We see no abuse of that discretion

here.  In the context of drug distribution offenses, firearms are viewed as "'tools

of the trade'--that is, means for the distribution of illegal drugs."    United States v.

Martinez , 938 F.2d 1078, 1083 (10th Cir. 1991).  As such, they are probative of

a defendant's participation in the drug distribution business and in the particular

charged distribution offenses, and it is immaterial that Mr. Bailey was not being

tried for any offense directly related to his possession of firearms.    See id.

Indeed, several witnesses testified that Mr. Bailey carried a firearm during drug

transactions.  Finally, while the evidence was unfavorable, it was by no means so

unfairly prejudicial as to "be misleading and not aid and assist the jury in making

a material determination in the case."    Flanagan , 34 F.3d at 953 (quotation

omitted). [3]

C.    Insufficiency of the Evidence

Mr. Bailey contends generally, without identifying specific convictions

or elements of his crimes, that the evidence was insufficient to support them,

---

[3]    We note that in his argument, Mr. Bailey has reversed the relative weights of the probative value and unfair prejudice of the evidence, arguing incorrectly that the probative value of the evidence must substantially outweigh the potential for unfair prejudice.  Under Rule 403, the analysis is the other way around.

creating a mere suspicion of guilt because the witnesses were not credible.  He

argues that "the evidence in this case, consisting almost entirely of testimony

from individuals with a high motivation to make up a story, renders his conviction

suspect and warrants reversal."  Mr. Bailey's Br. at 33.  The crux of his argument

is that the testimony by his various coconspirators was not credible because

"[e]ach of these witnesses had three things in common:  each was a drug dealer,

each was a drug addict, and each had been promised they would not be prosecuted

if he or she testified against Mr. Bailey."     Id. at 6.

In reviewing the sufficiency of the evidence to support a jury verdict, we

examine the record de novo and ask whether, viewing the evidence in the light

most favorable to the government, a reasonable jury could find the defendant

guilty beyond a reasonable doubt.      See United States v. Voss   , 82 F.3d 1521,

1524-25 (10th Cir. 1996).  Mr. Bailey does not contend that, if believed, the

testimony of his coconspirators would not be sufficient to support his convictions.

His argument is based solely on their lack of credibility.  However, the facts that

the witnesses were drug users involved in the conspiracy and that they would not

likely be prosecuted if they testified were brought out at trial.      [4]  Additionally, the

court instructed the jury that, in making its credibility assessments, it should

---

[4]     Only one of the witnesses had an actual agreement with the government
precluding prosecution.

-13-

specifically consider these facts. The jury obviously found them credible, no doubt in part because they were consistent with Mr. Bailey's own incriminating statements. We will not second-guess the jury's credibility determination, see United States v. Yoakam, 116 F.3d 1346, 1349 (10th Cir. 1997), and we conclude that the evidence created much more than a mere suspicion of guilt and was more than sufficient evidence to support the convictions. [5]

D. Admission of Testimony Bolstering the Credibility of Informant Witnesses

---

[5] In further effort to challenge the testimony of his coconspirators, Mr. Bailey filed a motion for leave to file a supplemental opening brief to argue that these witnesses' testimony should have been inadmissible under 18 U.S.C. § 201(c)(2). See United States v. Singleton, 144 F.3d 1343 (10th Cir. 1998), vacated and reh'g en banc granted, (10th Cir. July 10, 1998). Mr. Bailey did not file this motion until eight months after he filed his opening brief and four months after the government's response. He did not raise this argument in the district court, and the only reason he gives for failing to include it in his opening brief is that the argument had never occurred to his counsel. Generally, the failure to raise an issue in the opening brief waives appellate consideration of the issue. See State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 984 n.7 (10th Cir. 1994); see also United States v. Brown, 108 F.3d 863, 867 (8th Cir. 1997) (rejecting request to consider issue raised for first time in reply brief where party "has not offered any justification for its failure to raise issue in its initial brief"); United States v. Ullah, 976 F.2d 509, 514 (9th Cir. 1992) (noting exceptions to general rule only for "good cause shown" or "manifest injustice," issues raised first by appellee, and issues for which consideration would not result in prejudice to opposing party). Powell has provided no valid reason for deviating from the general rule, and we therefore deny his motion.

-14-

Both Mr. Bailey and Ms. Baker [6] challenge the district court's admission of Detective Haskins' testimony regarding his work with informants, in which he testified as follows:

Q. How critical, how important are [informants] to the successful investigation of a narcotics case?

. . .

The Witness: It is almost impossible to work narcotics without the use of confidential informants and informants.

. . .

Q. Okay. Now when an informant comes to you with some information, whether it be--in any kind of case, particularly a drug case, do you just automatically rely on what that person tells you?

. . .

THE WITNESS: No, sir. We do not just take it at their word. We try to track and corroborate what they tell us. We do this through many ways, you know, through the use of other informants that have proven theirself. We also--through acquisitions through subpoenas and getting phone tolls, pulling motel records through use of subpoenas, many things of this nature trying to corroborate what they're telling us to prove that it is true and the validity of what they're saying is reliable.

R. Vol. IV at 460, 462-63. Defendants contend that this testimony was directed solely at bolstering the credibility of the informant witnesses, which they claim is improper under United States v. Cruz, 981 F.2d 659, 663 (2d Cir. 1992).

---

[6] Ms. Baker adopted Mr. Bailey's argument on this point.

In Cruz, a government expert testified to a pattern of criminal activity similar to the defendant's activity as described by fact witnesses. The Second Circuit held that the government could not present expert testimony "solely to bolster the credibility of [its] fact-witnesses by mirroring their version of events," at least where the witnesses' accounts are not assailed as implausible. Id. at 664.

While it is not entirely clear why the government elicited Detective Haskins' testimony--he was not testifying as an expert, although the government may have been trying to qualify him as one--we do not agree with defendants that its sole purpose was to bolster the credibility of the witnesses. The testimony went to why the government used informants, not that they were necessarily truthful. Detective Haskins explained the difficulty encountered by law enforcement officers in infiltrating drug organizations and the need for informants in that regard. He also explained the need to corroborate the information provided by informants. The testimony did not "mirror" that of any other witnesses, as was the case in Cruz, nor did the government later refer to the testimony in an attempt to bolster the witnesses' credibility. See Headley v. Tilghman, 53 F.3d 472, 476 (2d Cir. 1995) (noting, in rejecting similar argument, that it was "most important[]" that prosecutor in summation did not rely on allegedly improper testimony to bolster credibility of fact witnesses). We

conclude that the challenged testimony had little, if any, effect in bolstering the witnesses' testimony, and that the district court did not err in allowing it.

### III Sentencing Issues

Both Mr. Bailey and Ms. Baker challenge the district court's finding that the drug involved was d-methamphetamine and that the total amount of the drug attributable to the conspiracy was thirty-three pounds. [7] Ms. Baker also contends that the district court failed to make the required findings supporting its determination that all thirty-three pounds should have been attributed to her, and that she should be held accountable for a smaller amount because of her lesser role in the conspiracy.

The government has the burden of proving by a preponderance of the evidence both the type and amounts of controlled substances related to the offense. See United States v. Jones, 80 F.3d 436, 439 (10th Cir. 1996); United States v. Deninno, 29 F.3d 572, 578, 580 (10th Cir. 1994). Both of these are factual matters that we review for clear error. See Jones, 80 F.3d at 439; Deninno, 29 F.3d 572, 578, 580. Under this standard, "[w]e will not reverse a district court's finding unless it was without factual support in the record, or we are left with the definite and firm conviction that a mistake has been made after

---

[7]     Ms. Baker adopted Mr. Bailey's arguments on these points.

reviewing all of the evidence." United States v. Lande, 40 F.3d 329, 330 (10th Cir. 1994). We review the district court's application of the sentencing guidelines de novo. See United States v. Melton, 131 F.3d 1400, 1403 (10th Cir. 1997).

A.    Type of Drug

At the time of the relevant criminal activity for which defendants were convicted, the sentencing guidelines treated d-methamphetamine much more severely than l-methamphetamine. See, e.g., Lande, 40 F.3d at 330 n.1. [8] The government seized no drugs from defendants. They contend that the evidence does not support the district court's finding that the drug involved in the conspiracy was d-methamphetamine rather than l-methamphetamine. Alternatively, they contend that they should be resentenced based on an equivalent amount of amphetamine, which is treated less severely than d-methamphetamine, because none of the witnesses who received drugs from Mr. Bailey could distinguish between the two.

Despite the fact that no drugs were seized from defendants in this case, the government may prove the type of drug involved in the conspiracy through circumstantial evidence. See Jones, 80 F.3d at 439; Lande, 40 F.3d at 331.

---

[8]    The distinction has since been eliminated. See United States v. Svacina, 137 F.3d 1179, 1186 (10th Cir. 1998).

Drugs seized from a supplier or associate may be used to show the type of drug involved. See Jones, 80 F.3d at 439. When Rocky Miller, Mr. Bailey's supplier, was arrested in February 1995 in Pauls Valley, Oklahoma, he was found with a syringe that tests revealed contained methamphetamine. Telephone records indicated calls to defendants' house from the Pauls Valley jail while Miller was incarcerated there. In March 1995, Miller was arrested in Potter County, Texas, and over 700 grams of d-methamphetamine was confiscated from him. Documents related to his release from jail indicated he listed defendants as references. John Noble stated that Mr. Bailey had supplied him with methamphetamine. Noble was arrested in October 1995 with over 460 grams of d-methamphetamine. Additionally, a number of witnesses testified that the methamphetamine they received from Mr. Bailey was very high quality, and there was evidence that l-methamphetamine had no street value because of its low quality. Cf. Lande, 40 F.3d at 330 (noting evidence that l-methamphetamine has little if any stimulating properties compared to d-methamphetamine). Given this evidence, we cannot say that the district court erred in finding that the drug here was d-methamphetamine.

B.     Quantity of d-methamphetamine

"When the actual drugs underlying a drug quantity determination are not seized, the trial court may rely upon an estimate to establish the defendant's

guideline offense level, so long as the information relied upon has some basis of support in the facts of the particular case, and bears sufficient indicia of reliability." United States v. Ruiz-Castro, 92 F.3d 1519, 1534 (10th Cir. 1996) (quotations omitted). In determining the amount of d-methamphetamine attributable to the conspiracy, the district court relied on the testimony of Tammy Baker, who said she saw six pounds in August 1994 and five pounds in August 1995 at defendants' house; the testimony of Brandon Huntley, who said he saw five pounds at the house in May 1995; a statement by John Noble, who said that he received deliveries of two pounds from Mr. Bailey in February 1995 and that Mr. Bailey picked up from him a box left by Miller containing five pounds in February or March 1995; and a statement from Mr. Bailey that he delivered ten pounds to Kelly Paul in August 1995. Defendants contend that the testimony and statements were too vague as to quantity and time to support the district court's finding as to quantity. "The credibility of a witness whose testimony is relied upon at sentencing is for the sentencing court to analyze." United States v. Sloan, 65 F.3d 861, 865 (10th Cir. 1995). While we agree that some of this evidence was somewhat vague, we cannot say that it was so vague or lacking in reliability that we have a firm conviction that the district court erred in relying on it. We therefore reject defendants' challenge to the district court's determination of the total amount of d-methamphetamine involved.

-20-

C.    Quantity Attributable to Ms. Baker

Because Ms. Baker was convicted of conspiracy, U.S.S.G. § 1B1.3 governs the quantity of methamphetamine that the district court should have attributed to her.  See Melton, 131 F.3d at 1403.  That section provides that, in the case of jointly undertaken criminal activity, the defendant's base offense level shall be determined based on "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."  § 1B1.3(a)(1)(B).  Thus, for sentencing purposes in a drug conspiracy case, a defendant is accountable for that quantity of drugs that was both within the scope of her agreement and reasonably foreseeable to her.    See United States v. Johnston, 146 F.3d 785, 795 (10th Cir. 1998);   United States v. Arias-Santos, 39 F.3d 1070, 1078 (10th Cir. 1994);   United States v. Reid, 911 F.2d 1456, 1462 (10th Cir. 1990);   see also Melton, 131 F.3d at 1405 ("[R]easonable foreseeability is not by itself sufficient to establish liability for the acts of coconspirators.  To be considered as relevant conduct, such acts also must be in furtherance of 'jointly undertaken criminal activity.'") (quotation omitted).    [9]  Moreover, the

_____

[9]    In its argument regarding the amount of drugs for which a coconspirator can be accountable, the government relies on    United States v. Ivy, 83 F.3d 1266,
(continued...)

-21-

[9](...continued)
1291 (10th Cir. 1996), which stated this rule in the disjunctive rather than conjunctive: "'The drug amount attributable to a defendant for purposes of sentencing is not established merely by looking to the amount of drugs involved in the conspiracy as a whole, [but only to] the quantity of drugs which he reasonably foresaw *or* which fell within "the scope" of his particular agreement with the conspirators.'" Id. (quoting United States v. Roberts, 14 F.3d 502, 522 (10th Cir. 1993)) (alteration in original; citation omitted; emphasis added). Because Ivy and Roberts (and the subsequently issued United States v. Cruz Camacho, 137 F.3d 1220, 1225 (10th Cir. 1998)) conflict with earlier circuit authority, see Reid, 911 F.2d at 1462; United States v. Russell, 963 F.2d 1320, 1323 (10th Cir. 1992); United States v. Evans, 970 F.2d 663, 676 (10th Cir. 1992); United States v. Coleman, 7 F.3d 1500, 1504 (10th Cir. 1993), we must follow the earlier authority because a "published decision of one panel of this court constitutes binding circuit precedent constraining subsequent panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court." Haynes v. Williams, 88 F.3d 898, 900 n.4 (10th Cir. 1996); see also id. ("A pertinent corollary to this principle is that when faced with an intra-circuit conflict, a panel should follow earlier, settled precedent over a subsequent deviation therefrom.").

We also note that the conjunctive rule is clearly consistent with the sentencing guidelines:

> In the case of a jointly undertaken criminal activity, subsection (a)(1)(B) provides that a defendant is accountable for the conduct (acts and omissions) of others that was both:
>
> (i)     in furtherance of the jointly undertaken criminal activity; and
>
> (ii)    reasonably foreseeable in connection with that criminal activity.
>
> . . . In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake ( i.e., the scope of the specific conduct

(continued...)

scope of a defendant's agreement is not necessarily the same as the scope of the entire conspiracy. See id.; see also § 1B1.3, Application Note 2 ("Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the criminal activity jointly undertaken by the defendant . . . is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant."). Additionally, "[p]roper attribution at sentencing requires the district court to analyze, and make 'particularized findings' about, the scope of the specific agreement the individual defendant joined in relation to the conspiracy as a whole." Melton, 131 F.3d at 1404.

Ms. Baker contends that the district court erred by attributing to her all of the methamphetamine involved in the conspiracy based solely on the fact that she was part of the conspiracy and by failing to make the required finding as to the

---

[9](...continued)
> and objectives embraced by the defendant's agreement). The conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant is relevant conduct under this provision. The conduct of others that was not in furtherance of the criminal activity jointly undertaken by the defendant, or was not reasonably foreseeable in connection with that criminal activity, is not relevant conduct under this provision.

§ 1B1.3 Application Note 2.

scope of the criminal activity she agreed to undertake. In attributing all of the methamphetamine involved in the conspiracy to Ms. Baker, the district court stated:

> I know throughout Defendant Baker's objections she has objected to the fact that these amounts are attributable to her, but the jury did convict her of being a part of the conspiracy, and I heard that testimony, and although I agree that Mr. Bailey was certainly the head of this organization, I'm satisfied she was intimately involved in it and should be held accountable for all the drugs that I have found today were a part of this conspiracy.

R. Vol. V at 128.

The evidence showed that Ms. Baker was fully aware of the large quantities of methamphetamine being distributed as part of this conspiracy and that she actively participated in virtually all phases of it -- receiving drugs, distributing drugs, counting proceeds, hiding proceeds, and sharing proceeds. The district court, having presided over the trial, was acutely aware of the extent of Ms. Baker's involvement. Her presentence report specifically asserted Ms. Baker "was aware that Bailey was distributing methamphetamine from their residence, accompanied Bailey to deliver and obtain methamphetamine, and delivered methamphetamine to Brandon Huntley and Linda Stumpf. The defendant also benefitted from the proceeds obtained from the distribution of this methamphetamine." R. Vol. VII at 6. The record discloses that the defendant was present when large amounts of drug proceeds were counted and that she was

-24-

aware that $155,000 in proceeds was stored in the attic of her residence. The district court recounted some of the additional evidence relating to Ms. Baker, including the fact that she made a statement to police about receiving 13-15 pounds in the summer of 1995.

The evidence fully supports the court's findings regarding the scope of Ms. Baker's agreement and the amount of drugs for which she should be accountable. Under these circumstances, when the district court concludes that the defendant "was intimately involved in [the conspiracy] and should be held accountable for all the drugs," it is clear what that entails. The court's attribution to her of all drugs involved in the conspiracy was not improper, and its ruling adequately addressed the scope of her agreement.

**IV Conclusion**

We AFFIRM Mr. Bailey's and Ms. Baker's convictions and sentences. Mr. Bailey's motion for leave to file a supplemental opening brief is DENIED.

Entered for the Court

Wesley E. Brown
District Judge

Nos. 97-6311 and 97-6312, UNITED STATES v. BAKER and BAILEY

**McKAY** , Circuit Judge, concurring in part and dissenting in part:

I join in all of the court's opinion except the portion in section III dealing with the degree of Ms. Baker's participation for purposes of sentencing.

As I understand the court's opinion, it accepts that United States v. Melton, 131 F.3d 1400 (10th Cir. 1997), correctly states the law–that a defendant in a conspiracy case is accountable for the amount of drugs that was within the scope of her agreement and reasonably foreseeable to her–and thus implicitly accepts that the government's argument is based on the wrong standard. In addition, the court recognizes that the district court must make particularized findings regarding the scope of the conspirator's agreement.

While the court discusses the available evidence that might support a court's finding regarding the scope of Ms. Baker's agreement, the fact that evidence was available is not the same as making the required particularized findings. Particularity may be in the eye of the beholder, but a court's statements that it heard the evidence, that the defendant was intimately involved in the conspiracy (though admittedly less than her co-defendant), and that she is therefore accountable for all drugs involved in the conspiracy cannot qualify as particularized findings under any reasonable interpretation of the word "particularized," especially in light of the specific prohibition against attributing all drugs in a conspiracy to all co-conspirators regardless of the scope of their agreement. Saying that a co-conspirator is "intimately involved" in a conspiracy

is not the same as making a particularized finding regarding the scope of her agreement.

Moreover, as Appellant points out, there were really two separate aspects of this conspiracy–the retail sale of small amounts of methamphetamine and the distribution or couriering of large amounts of methamphetamine. It is clear that Ms. Baker was intimately involved in the retail sales aspect of the conspiracy. Generally, Ms. Baker was with Mr. Bailey at the house or in his car when the sales occurred, or she actually handled them herself. But much of the quantity with which Ms. Baker was charged (which was the same amount as for Mr. Bailey) consisted of large (two- or five-pound) quantities with which she was not directly involved. Mr. Bailey picked up or delivered seventeen pounds to or from John Noble and Kelly Paul. It is not so clear that Ms. Baker was involved in these transactions.

I am not prepared at this stage of the proceeding to say that there is no evidence from which the district court could have made a particularized finding that Ms. Baker should be charged with the entire amount of drugs for which Mr. Bailey was charged–just that it did not make these findings. While I am not confident that the court would reach a different result on remand, the particularity requirement is there precisely to force the trial court to examine carefully the difference between the fuzzy, feel-good requirements of general conspiracy law

and the detailed evidence of specific participation when it comes to sentencing. I think we do a great disservice to the discipline of the law when we undertake to find what the trial court has both the duty and the discretion to find.

I would remand Ms. Baker's sentence to the trial court for proper findings and re-sentencing if dictated by those findings.